UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| DANIEL TRETO, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) No. 1:22-cv-00840-JMS-TAB |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Respondent. | ) |

**Order Denying Motion for Relief Pursuant to 28 U.S.C. § 2255**

For the reasons explained in this Order, Daniel Treto's motion for relief pursuant to 28 U.S.C. § 2255 must be **denied** and the action **dismissed with prejudice**. In addition, the Court finds that a certificate of appealability should not issue.

**I. The § 2255 Motion**

A motion pursuant to 28 U.S.C. § 2255 is the presumptive means by which a federal prisoner can challenge his conviction or sentence. *See Davis v. United States*, 417 U.S. 333, 343 (1974). A court may grant relief from a federal conviction or sentence pursuant to § 2255 "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). "Relief under this statute is available only in extraordinary situations, such as an error of constitutional or jurisdictional magnitude or where a fundamental defect has occurred which results in a complete miscarriage of justice." *Blake v. United States*, 723 F.3d 870, 878-79 (7th Cir. 2013) (citing *Prewitt v. United States*, 83 F.3d 812, 816 (7th Cir. 1996); *Barnickel v. United States*, 113 F.3d 704, 705 (7th Cir. 1997)).

## II. Facts and Procedural Background

**A. Criminal Proceedings**

On March 30, 2022, represented by Ms. Gwendolyn Beitz, Mr. Treto pled guilty to 6 counts of child pornography/sexual exploitation of a child related to 6 different victims. *United States v. Treto*, No. 1:20-cr-00177-JMS-DML, dkt. 75 (Crim. Dkt.). The Guidelines sentence he faced was 170 years, with a statutory minimum of 15 years. Crim. Dkt. 63 at 1-2. The United States agreed to a plea deal in which it would ask for no more than 365 months, but sentencing was left to the Court's discretion. Dkt. 55. During the combined change of plea and sentencing hearing, there was some discussion of Mr. Treto having difficulty "communicating" and the hearing was stopped several times for him to clarify things with Ms. Beitz.

For instance:

> Q: Are you suffering from any mental health issues today that you believe interferes with your ability to understand what is happening?
>
> A. No.
>
> Q: Okay. You are hesitating. Do you want to explain why?
>
> (Off-the-record discussion.)
>
> A: After speaking to my counsel, I – I can move forward and say I do not have any issues.

Crim. Dkt. 87 at 6-7. There were several other instances where the Court went off the record so he could consult with Ms. Beitz as he was questioned regarding the plea agreement and the rights he was waiving.

During his allocution, Mr. Treto stated:

> My counsel has advised me to keep my remarks and apology short, as I have difficulties with conveying myself while staying on track.
> . . .
> I struggle to communicate with my own lawyer or the people who could have impacted my case, such as the prosecuting team. So

2

> knowing that I have spent years and years attempting to speak coherently, one who doesn't would feel more hopeless. . . .
>
> Your honor, before coming into federal custody I was in the process of getting behavioral and mental therapy. It has been unfortunate that I never got to seek it while detained, as it wasn't available. . . .
>
> While I have many issues that may have helped mitigate and explain my own justifiable rationale, I was advised it wasn't a good idea, even more so, as it would have extended sentencing even further.

*Id.* at 47, 49-50.

During her sentencing argument, Ms. Beitz stated:

> [He] does struggle with communicating effectively what it is that – what it is he is thinking, what it is that he is feeling. He does the best he can to do that, but he is correct, that over the last two and a half years that we have had extensive conversations, extensive meetings, and I can certainly represent to the Court that he tries. . . .
>
> [H]e was genuinely trying to explain what he understood was happening with the computer, what was happening with the communications, and he did his very best for several hours to do that. . . . But often, sometimes there was – he was just unable to fully find the words to be able to explain his position.

*Id.* at 52-53.

The presentencing report said, with regard to Mr. Treto's mental and emotional health:

> Mr. Treto stated he has never participated in mental health counseling. At age 14, he would attend voluntary groups at The Anderson Center; however, he only went "to interact with people."
>
> As an adult, the defendant reported, "I contained my own mental health." He stated he has diagnosed himself with depression, dyslexia, and maybe schizophrenia.
>
> He stated he feels depressed because of the secondary trauma he has experienced through hearing other people's stories throughout his life. He feels as if he may have schizophrenia because he experiences visual and auditory hallucinations and has throughout his entire life. He indicated he sees people, animals, shadows, and hears things. He stated he "leaves it alone." Mr. Treto stated he has never "wanted" to have a mental health evaluation. He is not interested in mental health treatment and does not believe in taking medications.

3

Crim. Dkt. 72.

The presentence investigation report also related disturbing details of Mr. Treto's interactions with the minor victims, who were between 10-15 years of age. *Id.* at 6-11. This included encouraging a victim to engage in bestiality, and another to engage in self-harm, and threatening the victims with violence. *Id.* Mr. Treto described his communications with the victims as "ediginess." *Id.* at 6.

Ms. Beitz did not submit a sentencing memorandum. At the sentencing hearing, she essentially argued (1) Mr. Treto accepted responsibility by cooperating with authorities and pleading guilty; (2) his relatively young age and expressed desire to seek sex offender treatment meant there was a high likelihood he could change and be released before he was too old. She argued for a sentence of 20 years. Crim. Dkt. 87 at 57. The government argued for 30 years. *Id.* at 59. Ultimately, the Court imposed a 25-year sentence. Crim. Dkt. 81.

**B. 2255 Proceedings**

Less than a month after sentencing, Mr. Treto filed this action under § 2255. Dkt. 1. In part, Mr. Treto stated under oath that Ms. Beitz "held an opinion shared to my family and friends that she believed there was at the very least one [mental health issue] which has seemed apparent, Asperger's disorder, on the autism spectrum disorder." *Id.* at 5. He claimed Ms. Beitz provided ineffective assistance by not investigating whether he in fact was on the autism spectrum and to present such evidence as a sentencing mitigator.

The Court appointed counsel to represent Mr. Treto after concluding that resolution of his claims would require an evidentiary hearing. Dkt. 20. The Court also provided funds for and assisted in arranging for Mr. Treto to be evaluated by a psychologist, Dr. David Gavisk. Dkt. 27. Dr. Gavisk has completed a report following that evaluation. Dkt. 48-1. The report acknowledges

4

that Mr. Treto "has no previous diagnosis of autism spectrum disorder." *Id.* at 6. But, Dr. Gavisk concluded, "**[a] diagnosis of Autism is indicated.** Autism has affected most aspects of Daniel's life, throughout his life." *Id.* at 9 (emphasis in original). The overall assessment of Mr. Treto states:

> Concerns are noted with his ability to inhibit impulsive responses, adjust to changes in routine or task demands, monitor social behavior, and initiate problem solving or activity. Daniel's ability to modulate emotions, sustain working memory, plan and organize problem-solving approaches, attend to task-oriented output, and organize environment and materials is not described as problematic.

*Id.* at 13. The report described Mr. Treto's autism as "moderate" and that he could have "mild to moderate interference with everyday social interactions." *Id.* at 21. The report does not clearly indicate whether Mr. Treto's autism would or should have been obvious to other persons interacting with him.

The Court held a hearing in this matter on December 9, 2025.[1] Dkt. 45. Mr. Treto did not call Dr. Gavisk to testify; nonetheless, the government did not object to the post-hearing submission of Dr. Gavisk's report to the Court. Dkt. 46 at 5. Mr. Treto's brother, Carlos, testified that Ms. Beitz had told his family at some point that she suspected Mr. Treto was "on the spectrum." *Id.* at 9. After that comment was made, Carlos conducted research about autism and believed that Mr. Treto had communication difficulties that would be consistent with autism. *Id.* at 10-11.

The only other witness to testify was Ms. Beitz. She has worked as an assistant federal defender since 2012, with 80 to 85 percent of her caseload involving sex offenses. *Id.* at 14-15. Although she has had some experience with persons with autism, both professionally and in her personal life, she has no specialized training in psychology or in recognizing symptoms of autism.

---

[1] Due to illness, the undersigned was unable to attend the hearing in person. At the outset of the hearing, the parties consented to the undersigned presiding by Zoom. Dkt. 46 at 3.

*Id.* at 15-16. She testified that Mr. Treto could be "awkward" or have difficulty "read[ing] a room," and that she sometimes had to explain certain things to him repeatedly. *Id.* at 22. Still, he "was always appropriate in court" and "more relaxed" during his meetings with Ms. Beitz. *Id.* She did not suspect that he might have autism, and she did not attempt to have him evaluated regarding his alleged communication difficulties. *Id.* at 22-23, 37.

Ms. Beitz agreed that Mr. Treto had expressed to her in a letter that he had trouble communicating sometimes, because he would go on "tangents with excessive detail or clarification" and end up frustrating members of the prosecution team or causing difficulties with Ms. Beitz. *Id.* at 27-29. Mr. Treto did not always give direct answers to investigators' questions, but Ms. Beitz believed that was "pretty common, especially after somebody has just been arrested and they're still kind of in shock." *Id.* at 30. She also noted that despite some communication difficulties at times, "I had observed that he could communicate directly with very goal-oriented behavior at times." *Id.* at 75.

Ms. Beitz also related that Mr. Treto had expressed a clear desire not to be tested for anything that might result in mental health therapy or treatment of some kind. *Id.* at 37, 42. He did, however, express an openness to seeking mental health treatment during the sentencing hearing, and also to his brother Carlos. *Id.* at 42.

Ms. Beitz related that on a prior occasion, she had had a client evaluated for autism and presented that diagnosis to a court at sentencing, but it did not have "a great impact . . . ." *Id.* at 48. Specifically with respect to Mr. Treto, Ms. Beitz believed that even if he had been evaluated and diagnosed with autism, and evidence of such could have been presented at sentencing, she would have had concerns with doing so, especially after reviewing his disturbing communications with the victims. *Id.* at 49, 62. She explained:

> [L]et's say I have a diagnosis that he is autistic, that is a double-edged sword because it could be -- when the Court is looking at whether or not this could ever happen again and whether or not this person is a danger to the community, I don't want to present that person as somebody who doesn't have the ability to have empathy or somebody that would be later future -- is more future -- in the future, likely to have the same reaction if a child or somebody asks for -- you know, begs for help, begs for mercy, begs to not have to do something. I would not want the Court to view this person as, because they have this autism, it's an excuse, therefore, more likely to do it again.

*Id.* at 49-50. She also never observed any indication that Mr. Treto was not competent to understand the proceedings, and that he fully understood the plea agreement. *Id.* at 53-54, 57. She also did not recall ever telling Mr. Treto's family that she suspected he was "on the spectrum." *Id.* at 60. Furthermore, Ms. Beitz believed "it would have absolutely backfired" if she had attempted to argue autism as a mitigator in Mr. Treto's case, particularly given her experience with the Assistant U.S. Attorney, Kristina Korobov. *Id.* at 61-62.

At the conclusion of the hearing, the Court gave the parties the opportunity to file proposed findings and conclusions, 30 days after completion of the transcript. Both Mr. Treto and the government have done so. Dkts. 48, 49.

### III. Discussion

A § 2255 movant claiming ineffective assistance bears the burden of showing (1) that counsel's performance fell below objective standards for reasonably effective representation and (2) that this deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 688–94 (1984); *Resnick v. United States*, 7 F.4th 611, 619 (7th Cir. 2021). If a petitioner cannot establish one of the *Strickland* prongs, the Court need not consider the other. *Groves v. United States,* 755 F.3d 588, 591 (7th Cir. 2014). To satisfy the first prong of the *Strickland* test, the petitioner must direct the Court to specific acts or omissions of his counsel. *Wyatt v. United States,* 574 F.3d 455,

7

458 (7th Cir. 2009). The Court must then consider whether in light of all of the circumstances counsel's performance was outside the wide range of professionally competent assistance. *Id.* On the prejudice prong, a petitioner "must show that but for counsel's errors, there is a reasonable probability that the result would have been different." *Perrone v. United States*, 889 F.3d 898, 908 (7th Cir. 2018) (citation modified).

"The *Strickland* protections apply not only in criminal trials but also at sentencing, where the defendant's counsel is expected to offer a case to mitigate punishment." *Laux v. Zatecky*, 890 F.3d 666, 674 (7th Cir. 2018). Thus, "defense counsel has an 'obligation to conduct a thorough investigation of the defendant's background' in advance of such proceedings, with an eye toward evidence that speaks in the client's favor." *Id.* (quoting *Williams v. Taylor*, 529 U.S. 362, 396 (2000)). In assessing whether trial counsel performed ineffectively at sentencing, the court must "evaluate the totality of the available mitigation evidence in deciding whether counsel was ineffective." *Id.* (cleaned up). "The Sixth Amendment does not require counsel to investigate every conceivable line of mitigation evidence—it requires counsel to make reasonable decisions about which matters to pursue." *Id.* at 675.

"Where it is apparent from evidence concerning the crime itself, from conversation with the defendant, or from other readily available sources of information, that the defendant has some mental or other condition that would likely qualify as a mitigating factor, the failure to investigate will be ineffective assistance." *Hall v. Washington*, 106 F.3d 742, 749-50 (7th Cir. 1997). In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691.

8

The Court notes that in *McMullen v. Dalton*, 83 F.4th 634 (7th Cir. 2023), the Seventh Circuit reversed this Court's denial of habeas corpus relief to a state petitioner under 28 U.S.C. § 2254. The defendant's presentence report noted that he personally said his mental health was "ok" and had never been diagnosed with a mental illness but had concerns about depression. The PSR also mentioned "anger control" issues and trouble with alcohol. Defendant's attorney did not conduct any investigation into his mental health and he received a maximum 50-year sentence for drug charges. In his state post-conviction relief proceeding, there was evidence presented that the defendant had in fact been diagnosed with mental illnesses as a juvenile. State post-conviction relief was denied, which was upheld by the Indiana Court of Appeals, and this Court denied § 2254 relief. The Seventh Circuit, however, held there was the possibility defendant was prejudiced by defense counsel's failure to investigate his mental health, despite defendant personally denying to the probation officer that he had ever been diagnosed with mental health problems. The Seventh Circuit remanded to this Court to hold a hearing "to consider evidence and argument as to whether Lewis had any strategic reasons for the limits of his investigation into McMullen's mental health and background and the presentation of mitigating circumstances." *McMullen*, 83 F.4th at 648.[2]

Here, the Court has held such a hearing regarding Mr. Treto's claims. Even though Mr. Treto now does have an autism diagnosis, which the government does not dispute, the Court concludes that Ms. Beitz made a conscious and reasonable strategic decision not to explore before sentencing whether Mr. Treto was autistic. There is no evidence that Mr. Treto had a pre-existing diagnosis that Ms. Beitz overlooked. The Court further finds Ms. Beitz to be credible when she repeatedly related that she did not observe anything in Mr. Treto that might have warranted further investigation to rule out an autism diagnosis. Nothing in Dr. Gavisk's report calls her credibility

---

[2] On remand, the parties entered into an agreement that the petitioner be provided with a new sentencing hearing in state court. *McMullen v. Dalton et al.*, No. 2:19-cv-00356-JRS-MJD, dkt. 41.

into question on this point; the report itself describes Mr. Treto's autism-related communication problems as "mild to moderate." Dkt. 48-1 at 21.

Furthermore, Ms. Beitz provided solid reasoning as to why such a diagnosis might or likely would not have been helpful to Mr. Treto at sentencing. She is highly experienced in representing clients in federal court who have been charged with sex offenses. She related that Mr. Treto, at least to her, was consistently highly resistant to undergoing any type of mental health examination. She also explained how any argument she might have made regarding autism and Mr. Treto's difficulties in communication would be wholly contrary to his behavior in this case, where he clearly, coercively, and disturbingly was able to communicate online with numerous minors. Indeed, such an argument could "backfire," in that an autism diagnosis could highlight a lack of empathy. Ms. Beitz had particular experience with AUSA Korobov and how she would have addressed and attacked any argument that autism could have partially explained Mr. Treto's offenses or warranted a reduced sentence. And, Ms. Beitz has had prior experience in attempting to present autism as a mitigator at sentencing, without success. Giving "a heavy measure of deference" to Ms. Beitz's judgments, as *Strickland* requires, the Court concludes she made a reasonable strategic decision in declining to pursue or investigate the possibility that Mr. Treto was autistic prior to sentencing.[3]

---

[3] Given this finding, the Court need not evaluate whether Mr. Treto would have been prejudiced if Ms. Beitz had performed deficiently. To show prejudice by a defense attorney's deficient performance in not presenting mitigating evidence at sentencing, a 2255 petitioner "must present new evidence that 'alter[s] the sentencing profile presented to the sentencing judge.'" *Johnson v. United States*, 2016 WL 1394232, at *6 (S.D. Ill. Apr. 8, 2016), *aff'd*, 708 F. App'x 883 (7th Cir. 2018) (quoting *Strickland v. Washington*, 466 U.S. 668, 700 (1984)). Given that Mr. Treto eventually received a sentence very far below the Guidelines, and the heinousness of Mr. Treto's crimes, it is highly unlikely that an autism diagnosis would have significantly altered the sentencing profile presented to the Court.

### IV. Denial of Certificate of Appealability

A habeas petitioner does not have the absolute right to appeal a district court's denial of his habeas petition. Rather, he must first request a certificate of appealability. *See Miller–El v. Cockrell*, 537 U.S. 322, 335 (2003); *Peterson v. Douma*, 751 F.3d 524, 528 (7th Cir. 2014). Pursuant to Federal Rule of Appellate Procedure 22(b), Rule 11(a) of the Rules Governing § 2255 Proceedings, and 28 U.S.C. § 2253(c), the Court finds that Mr. Treto has failed to show that reasonable jurists would find "it debatable whether the petition states a valid claim of the denial of a constitutional right" and "debatable whether [this Court] was correct in its procedural ruling." *Slack v. McDaniel,* 529 U.S. 473, 484 (2000). The Court therefore **denies** a certificate of appealability.

### V. Conclusion

For the reasons explained in this Order, Mr. Treto is not entitled to relief on his § 2255 motion, and the Court denies a certificate of appealability. There was no ineffective assistance of counsel because Ms. Beitz did not perform deficiently in representing Mr. Treto. Accordingly, his motion for relief pursuant to § 2255 is **DENIED**, and this action is dismissed with prejudice. Judgment consistent with this Order shall now issue, and the Clerk shall **docket a copy of this Order in No. 1:20-cr-00177-JMS-DML.** The motion to vacate, Crim. Dkt. [85], shall also be **terminated** in the underlying criminal action.

**IT IS SO ORDERED.**

Date: 2/17/2026

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

All ECF-registered counsel of record via email

11